IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHAWNA BERG,<br><br>Plaintiff,<br><br>vs.<br><br>THE TXJ COMPANIES, a/k/a TJ MAXX, a foreign corporation; and DOES 1-3,<br><br>Defendants. | CV 12-11-M-DLC<br><br>ORDER |

Defendant TJX Companies, Inc. ("T.J. Maxx") has moved for summary judgment on all claims in this matter. For the reasons discussed below, the motion is granted in full. T.J. Maxx has also filed an unopposed motion to file some of the exhibits in support of its motion under seal. This motion is granted because the documents contain employee personal and medical information and proprietary information relating to T.J. Maxx's business operations.

## FACTS

Plaintiff Shawna Berg worked at the T.J. Maxx store in Missoula, Montana, from 2002 until her employment was terminated July 18, 2011. During her time with the company, Berg received several promotions, ultimately obtaining the

position of Store Manager, which she held until her last day of employment. Berg maintained a good working relationship with her district manager, Denis Lattin. In January 2010, Berg was informed by Lattin that the assistant managers in her store had complained that she did not respect them and did not let them do their jobs without interference. Lattin did not receive further complaints about Berg until late May 2011, and on April 7, 2011, he gave Berg an "exceeds expectations" rating on a performance review.

During the course of her employment, Berg experienced health issues and ultimately was diagnosed with and treated for colon cancer. She was approved to take four medical leaves of absence. Her first medical leave of absence began January 24, 2006 and continued through approximately March 4, 2006. Later, T.J. Maxx approved another medical leave of absence that lasted from September 3, 2010, through October 24, 2010. This was followed by an intermittent medical leave of absence so that Berg could participate in follow-up treatment, which began October 26, 2010, and continued through April 26, 2011. The following month, Berg developed a hernia related to her cancer treatments and required a final leave of absence that lasted from May 23, 2011, through July 10, 2011. In each case, T.J. Maxx approved the full leave Berg requested.

On May 27, 2011, while Berg was on leave, Lattin made an unscheduled

visit to the Missoula store. Three employees reported to him that Berg had grabbed an associate, Rachael Halstead, on the upper right arm hard enough to leave a bruise. The employees also relayed other concerns about Berg's management. Lattin initiated an investigation. He returned to the store on June 2 and 3, 2011, to interview numerous employees. Some of the employees reported that they were afraid of Berg, that she was a bully, and that she treated people unfairly. Specifically, Lattin was told about the incident where Berg allegedly bruised Halstead's arm, occasions when Berg swore in front of employees and customers, and interactions with Berg that were perceived to be unfair, intimidating, or overbearing. Lattin also viewed a videotape of the interaction between Halstead and Berg, confirming that Berg stopped Halstead at one point by holding or gripping her right arm and rubbing or caressing her left arm. Lattin was unable to tell by watching the video how tightly Berg held Halstead's arm, but Halstead and others reported that the incident left a bruise. Lattin credited the employees' reports about Berg's conduct, but Berg asserts that some of the employees socialized with her outside of work and may have had other reasons to want her terminated.

Berg remained on medical leave until early July. Prior to returning to work, she notified Lattin that she would need to leave early on her first day back in order

to take her daughter to the orthodontist. Lattin approved her request. At the time, Berg did not know that her daughter had cancer, and she did not tell Lattin that she would need any other time off in order to take of her.

Berg's first day back was July 11, 2011, and Lattin informed her about the complaints he had been investigating. Berg provided a written statement. Several other employees also provided written statements, largely repeating the information they had shared in their earlier interviews. Sometime later that day, Lattin informed Berg that she was being placed on paid administrative leave while T.J. Maxx completed its investigation.

During the investigation, Lattin conferred with Andrew Gibson, T.J. Maxx's Manager for Human Resources for the Pacific Region, about the employees' complaints and the investigation. Gibson then consulted with Soley McCabe, T.J. Maxx's Zone Associate Relations Manager at the time, emailing her the employees' statements and Lattin's summary of the investigation. Lattin, Gibson, and McCabe all agreed that termination was appropriate. They particularly focused on the bruise Berg had allegedly left on Halstead's arm as a violation of the prohibition on violence in the T.J. Maxx Code of Conduct, but they were also concerned about the workplace environment Berg had created. Berg's employment was terminated effective July 18, 2011.

Lattin later represented to T.J. Maxx's unemployment insurance claim processor that Berg was let go based on the act of grabbing Halstead's arm hard enough to leave a bruise. He also represented that the subsequent investigation revealed that the incident was part of an ongoing and escalating pattern of behavior. He stated that Berg was terminated specifically for violating T.J. Maxx's code against violence and threats of violence, which states that "you must not threaten violence, use offensive language, or engage in verbal abuse, harassment, intimidation or violent behavior in any form." (Doc. 42 at 1.) The Code of Conduct, which Berg acknowledged that she had read and agreed to follow, provides that "[v]iolations of this Code or Company policies may result in discipline, up to and including termination and/or legal action." (Doc. 41 at 6.) It requires managers to "[c]reate an environment of integrity, accountability, and mutual respect that supports doing the right thing" and to "[e]arn respect and lead by example." (*Id.* at 8.)

Berg pleads four causes of action in her Complaint. She alleges two claims under the Family and Medical Leave Act, stating that T.J. Maxx retaliated against her and interfered with her rights under the Act by refusing to reinstate her when she returned from a medical leave and terminating her employment. She also alleges that she was terminated in violation of the Wrongful Discharge from

Employment Act and that she is the victim of libel based on Halstead's report that she grabbed her arm and left a bruise. T.J. Maxx seeks summary judgment on each claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The movant's burden is satisfied when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

"[T]he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. The elements of each claim determine which facts are material. *Id.* Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude entry of summary judgment. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

## ANALYSIS

### I. Wrongful Discharge from Employment Act

Berg alleges that T.J. Maxx lacked good cause to terminate her employment because the reasons given for her termination were pretextual and based on a mistake. She concedes that T.J. Maxx did not violate any of it written policies.

In relevant part, the Wrongful Discharge from Employment Act provides that it is unlawful to discharge an employee if "the discharge was not for good cause and the employee had completed the employer's probationary period of employment." Mont. Code Ann. § 39-2-904(1)(b). "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate

business reason." § 39-2-903(5). A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993) (internal quotation marks and citation omitted).

To defeat a motion for summary judgment, an employee may "either prove that the reason given for the discharge is not 'good cause' in and of itself, or that the given reason is a pretext and not the honest reason for the discharge." *Becker v. Rosebud Operating Servs.*, 191 P.3d 435, 441 (Mont. 2008) (internal quotation marks and citation omitted). The employee must present "evidence, and not mere speculation or denial." *Kestell*, 858 P.2d at 8.

The evidence presented here does not support a finding of pretext or mistake. Berg's argument that the rationale given for her discharge has shifted over time relies on selective quotations of the record. She suggests that T.J. Maxx initially relied on the arm-holding incident to explain its decision to discharge her, but has since pointed to other misconduct that supports its decision. While the arm-holding incident sparked the investigation and was critical to the decision to terminate Berg, T.J. Maxx considered Berg's other behavior from the start. This is evidenced by the broad scope of the employees' initial reports to Lattin (doc. 32), Berg's response to other accusations when she was first confronted with the

employees' complaints (doc. 33), Lattin's inclusion of other incidents and conduct in his HR investigation report (doc. 32), the deposition testimony of Lattin, Gibson, and McCabe (docs. 50-1 at 10–11; 48-1 at 6, 14–15; 48-2 at 6–7), and Lattin's email to T.J. Maxx's unemployment insurance claim processor. In that email, Lattin stated that Berg was let go based on "one specific act of misconduct"—the arm-holding incident—but he also stated that the incident was part of an "ongoing and an escalating pattern" of behavior. (Doc. 50-1 at 16.) T.J. Maxx's argument that Berg's acts of bullying and intimidation and use of profanity contributed to the discharge decision is consistent with all the evidence in the case.

Berg contends that T.J. Maxx exaggerated the arm-holding incident in order to manufacture a reason to discharge her, presumably because she took medical leaves of absence. This speculation is not supported by the evidence. Lattin was told by three employees that Berg had grabbed Rachael Halstead's arm hard enough to leave a bruise. More than one employee reported seeing the bruise, Berg admitted holding Halstead's arm, and Lattin confirmed that Berg had in fact held or grabbed Halstead's right arm by viewing a videotape of the incident. Although he could not tell from the video how tight the hold was, the video was not inconsistent with the employees' reports. Nor is it material that Rachael

Halstead reported being grabbed by both arms when the video showed Berg holding her right arm and rubbing or caressing her left arm. Lattin considered all the evidence in determining that Berg had grabbed or held Halstead's right arm, leaving a bruise.

Berg also argues that T.J. Maxx should have questioned and verified the veracity of the employees' descriptions of her conduct. She notes that some of the employees socialized with her outside of work, that they might have had ulterior motives for wanting her discharged, and that she had received a positive performance evaluation just two months before Lattin's investigation began. It is not arbitrary to "terminate an employee who acted inappropriately some, but perhaps not all, of the time," *Sullivan v. Contl. Const. of Mont., LLC*, 299 P.3d 832, 838 (Mont. 2013), and the facts Berg highlights do not contradict Lattin's conclusions that Berg bruised Halstead's arm, bullied employees, and made them afraid to report her conduct earlier. The employees' statements to Lattin in individual interviews and via written statements illustrate a consistent picture of the workplace environment Berg managed, and T.J. Maxx was entitled to rely on the employees' statements in deciding to terminate Berg's employment. *Id.* at 837.

Whatever confusion there is in the record over who had the final authority to decide to terminate Berg and who made that decision initially is immaterial.

Lattin, Gibson, and McCabe all agreed that termination was appropriate and jointly participated in the decision, and Gibson and McCabe were permitted to rely on Lattin's reports of the investigation. *Id.*

T.J. Maxx possessed "broad discretion" to terminate Berg "if it believed it could not trust [her] as a manager to run the day-to-day operations." *Id.* at 836. It appropriately relied on employees' reports and Lattin's investigation in determining that Berg held or grabbed an employee's arm hard enough to leave a bruise, that she used profanity in front of employees and customers, and that employees felt intimidated and harassed and perceived her as a bully. T.J. Maxx's Code of Conduct prohibits "verbal abuse, harassment, intimidation, or violent behavior in any form," and it was not "false, whimsical, arbitrary or capricious" for Lattin, Gibson, and McCabe to conclude that any physical manipulation of an employee, particularly if it leaves a bruise, constitutes intimidation or violent behavior. *Kestell*, 858 P.2d at 7. T.J. Maxx acted within in its discretion when it concluded that all of this conduct violated its Code of Conduct, constituted a "failure to satisfactorily perform job duties," and that termination would serve a legitimate business purpose. Mont. Code Ann. § 39-2-903(5). T.J. Maxx has demonstrated good cause for its decision.

Berg has not pointed to any "specific facts" to support her argument that

T.J. Maxx's proffered rationale for her discharge is pretextual. Berg was granted each medical leave of absence she requested, and there is no evidence any employee or supervisor ever spoke negatively about her health or periods of leave. The only explanation in the record for why the investigation took place when she was on leave is consistent with T.J. Maxx's justification for her termination—that employees were too intimidated by Berg to report her conduct earlier or when she was present. Berg has failed to raise facts that could demonstrate that the given reason for the discharge was "not the honest reason for the discharge." *Becker*, 191 P.3d at 441.

Because T.J. Maxx's rationale for terminating Berg's employment was based on legitimate business purposes, *Kestell*, 858 P.2d at 7, and Berg merely speculates that the rationale was pretextual, T.J. Maxx is entitled to summary judgment on Berg's Wrongful Discharge from Employment Act claim.

## II. Family and Medical Leave Act

Berg alleges that T.J. Maxx "interfered" with her rights under the Family and Medical Leave Act ("FMLA") by refusing to reinstate her when she returned from a medical leave of absence and by terminating her employment while she was exercising her right to a medical leave of absence. Berg also asserts that the alleged failure to reinstate her and the decision to terminate her employment

constituted "retaliation" for exercising her rights under the FMLA.

There are two theories of recovery available under the FMLA—the "retaliation or discrimination theory and the entitlement or interference theory." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 995, 960 (10th Cir. 2002)). An allegation of a violation of 29 U.S.C. § 2615(a)(2) is a "discrimination" or "retaliation" claim. This section provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." § 2615(a)(2). Most circuits apply some version of the burden-shifting framework laid out in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973),[1] for analyzing FMLA discrimination or retaliation claims. *Sanders*, 657 F.3d at 960 (citations omitted).

Berg characterizes her claims as "retaliation" claims, concluding that the

---

[1]The *Sanders* court explained: "Under the *McDonnell Douglas* burden shifting framework, the plaintiff first must establish a 'prima facie case of discrimination or retaliation.' *Metoyer v. Chassman*, 504 F.3d 919, 931 n. 6 (9th Cir.2007). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate 'a legitimate, nondiscriminatory reason for the adverse employment action.' *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004). If the employer articulates a legitimate reason for its action, the plaintiff must then show that the reason given is pretextual. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003). '[A] plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.' *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir.2002) (internal quotation marks omitted)." 547 F.3d at 777 n. 3.

*McDonnell Douglas* test applies. But her claims are not retaliation claims. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) (noting that the plaintiff mischaracterized her wrongful termination claim as a discrimination claim). "[T]he anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because [she] has used FMLA leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Such violations fall under 29 U.S.C. § 2615(a)(1). *Id.*

An allegation of a violation of § 2615(a)(1) constitutes an "interference" or "entitlement" claim, and the Ninth Circuit generally does not apply the *McDonnell Douglas* burden-shifting framework to interference claims. *Sanders*, 657 F.3d at 777 (citing *Bachelder*, 259 F.3d at 1124). Section 2615(a)(1) provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. To state a prima facie interference claim, an employee must show "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Bachelder*, 259 F.3d at 1124. "Interference under § 2615(a)(1) has been interpreted broadly to not only include denial of FMLA rights, but also to

encompass instances where an employer has discouraged an employee from using FMLA leave, retaliated against an employee for having exercised or attempted to exercise FMLA rights, or otherwise caused the employee to suffer an adverse employment action as a consequence of taking FMLA leave." *Bushfield v. Donahoe*, 1:11-CV-00251-CWD, — F. Supp. 2d —, 2012 WL 6086848, *9 (D. Idaho Dec. 6, 2012) (citing 29 C.F.R. § 825.220(b), (c); *Bachelder*, 259 F.3d at 1125).

If protected FMLA leave is a factor in a decision to terminate an employee, a plaintiff has an interference claim rather than a retaliation claim. *Xin Liu*, 347 F.3d at 1133. "Employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). An employee "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125. At the summary judgment stage, the Court must determine "whether there is a triable issue of material fact as to whether the FMLA leave taken by [the employee] was impermissibly considered as a factor in her termination." *Xin Liu*, 347 F.3d at 1136.

Interference with an employee's right to reinstatement after returning from an FMLA leave also arises under 29 U.S.C. § 2615(a)(1). *Sanders*, 657 F.3d at

777. But the Ninth Circuit held in *Sanders* that the employer, not the employee, bears the burden of showing that FMLA leave was not a negative factor in the decision not to reinstate the employee. The court based its decision on the plain text of the Department of Labor regulations. *Sanders*, 657 F.3d at 779–80 (citing regulations). Once the employee asserts a prima facie interference claim based on the failure to reinstate her, the employer must show that the employee "would have been dismissed regardless of the employee's request for, or taking of, FMLA leave." *Sanders*, 657 F.3d at 779–80 (internal quotation marks and citation omitted). Because the employer bears this burden, the *Sanders* test for reinstatement claims is more similar to the *McDonnell Douglas* framework than *Bachelder*'s test for termination claims, but it is based on the regulatory language rather than common law.

Berg has asserted a prima facie interference claim by asserting that T.J. Maxx denied her benefits to which she was entitled under the FMLA and its regulations—the right to be reinstated upon her return and the right to not have her use of FMLA leave considered as a factor in a termination decision.

Berg's reinstatement claim fails, however, because she was reinstated to the same position and same pay when she returned to work. When she returned to work after her last medical leave of absence, Berg resumed her position as store

manager. Later that day, however, she was placed on paid administrative leave while Lattin completed his investigation of several employee complaints. Until she was terminated a few weeks later, Berg remained the store manager and was paid at the same level. There is no evidence that she would not have resumed the same duties upon the investigation's conclusion if Lattin, Gibson, and McCabe had instead concluded that her performance was unproblematic and complied with T.J. Maxx's Code of Conduct. Accordingly, Berg's claim is properly construed as a termination claim rather than a failure-to-reinstate claim.[2] To survive summary judgment, Berg must therefore show that there is an issue of material fact whether T.J. Maxx considered her use of FMLA leave as a negative factor when it decided to terminate her employment. *Xin Liu*, 347 F.3d at 1136.

Berg's argument primarily relies on the temporal proximity between her use of leave and her termination. In discrimination cases in which the *McDonnell Douglas* test applies, the Ninth Circuit has held that timing may be circumstantial evidence of a retaliatory intent. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). While "the employer's intent is irrelevant to a determination of liability" for a FMLA interference claim, *Sanders*,

[2]Even if the Court were to apply the *Sanders* test for reinstatement claims, it would reach the same conclusion. Defendants have shown that Berg would have been dismissed regardless of her taking of FMLA leave. *Sanders*, 657 F.3d at 779–80.

567 F.3d at 778 (citing, among other cases, *Xin Liu*, 347 F.3d at 1135; *Bachelder*, 259 F.3d at 1130), timing could still be circumstantial evidence, in some cases, that an employer wrongfully considered an employee's FMLA leave in making a termination decision.

In this case, however, all the evidence presented by the parties shows that the temporal proximity between Berg's use of FMLA leave and her termination had nothing to do with T.J. Maxx considering the FMLA leave as a negative factor. T.J. Maxx did not initiate its investigation because Berg was on FMLA leave. Rather, employees felt comfortable reporting Berg's conduct because she was absent. T.J. Maxx investigated and responded to the complaints when they were made, and there is no suggestion that it would not have investigated and responded to the complaints had they been made at a different time. Rather, the evidence shows that T.J. Maxx had previously investigated complaints about Berg in January 2010, again at the time the complaints were made. No reasonable juror could infer from the timing that T.J. Maxx considered Berg's use of FMLA leave as a factor when it decided to terminate her, and Berg has not presented any other evidence that her use of medical leave played a role in T.J. Maxx's decision.

Berg insists that she has shown that T.J. Maxx's alleged nondiscriminatory reasons for its termination or reinstatement decision are pretextual. Under the

*McDonnell Douglas* framework, a plaintiff's showing of pretext can defeat the defendant's showing of a legitimate reason for its decision. This step is not a part of the analysis under either *Bachelder* or *Sanders*, but even if it were, Berg has failed to raise a genuine issue of material fact to defeat T.J. Maxx's motion for summary judgment. Berg relies on the same arguments addressed above regarding her Wrongful Discharge from Employment Act claim, and her arguments fail for the same reasons. Mere speculation cannot defeat T.J. Maxx's motion. Accordingly, summary judgment will be granted in favor of T.J. Maxx on Berg's claims under the FMLA.

## III. Libel

Berg asserts a final claim against T.J. Maxx—libel. She alleges that T.J. Maxx's use of Rachael Halstead's "false or grossly exaggerated statement" concerning the arm-holding incident as justification for terminating her employment exposed T.J. Maxx to vicarious liability for Halstead's statements. Berg failed to respond to T.J. Maxx's motion for summary judgment as to this claim. Thus T.J. Maxx's arguments are well-taken.

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation that exposes any person to hatred, contempt, ridicule, or obloquy or causes a person to be shunned or avoided or that has a

tendency to injure a person in the person's occupation." Mont. Code Ann. § 27-1-802 (2012). A privileged publication includes a "communication without malice to a person interested therein by one who is also interested or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent or who is requested by the person interested to give the information." § 27-1-804(3).

Halstead's statements to T.J. Maxx were part of a confidential, internal employee complaint to T.J. Maxx, and beyond mere speculation, Berg has made no showing that Halstead made the statements with malice. Nor has Berg raised any issue of material fact regarding Halstead's and T.J. Maxx's respective interests in maintaining a safe and comfortable work environment. Thus, Halstead's statements are privileged under § 27-1-804(3). *See also* 50 Am. Jur. 2d § 307 (2006) ("A qualified privilege generally attaches to intracompany communications, including communications between . . . an employer and his or her employees.").

T.J. Maxx's use of Halstead's statements in supporting its termination decision is also privileged. The statements formed the basis, along with other evidence, for T.J. Maxx's response to the Department of Labor in the context of an unemployment benefits proceeding and for T.J. Maxx's arguments in this case.

Both contexts are privileged under Montana Code Annotated § 27-1-802(2), which covers communications in "any legislative or judicial proceeding or in any other official proceeding authorized by law." Berg has not suggested T.J. Maxx repeated Halstead's statements in any other context. Accordingly, summary judgment is granted in favor of T.J. Maxx on Berg's libel claim.

## CONCLUSION

Beyond mere speculation, there are no disputes over material facts in this case, and T.J. Maxx is entitled to summary judgment on each of Berg's claims.

IT IS ORDERED that T.J. Maxx's unopposed motion to file certain exhibits under seal (doc. 29) is GRANTED. The Clerk shall seal documents 32 through 42.

IT IS FURTHER ORDERED that T.J. Maxx's motion for summary judgment (doc. 30) is GRANTED. Judgment shall be entered in favor of T.J. Maxx on each claim, all deadlines are VACATED, and this case is CLOSED.

Dated this 24th of June 2013.

Dana L. Christensen, Chief District Judge
United States District Court